THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. REGINALD SALES *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 84—2212, 84—2213 cons.

Opinion filed December 30, 1986.—Rehearing denied January 30, 1987.

James J. Doherty, Public Defender, of Chicago (Alison J. Norwood, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Sharon Johnson Coleman, and William T. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendants, Reginald Sales and Roger Sales, were convicted of rape, armed violence, aggravated kidnaping, and armed robbery. Sentences were imposed solely on their rape convictions, with Roger receiving a 30-year term and Reginald receiving a 25-year term.

On appeal defendants contend: (1) they were denied a fair trial by improper prosecutorial trial tactics and arguments, and (2) the prosecutors improperly exercised their peremptory challenges to exclude potential black jurors solely because of their race. We reverse and remand because of prosecutorial misconduct.

The pertinent evidence adduced at trial was as follows. The complainant, Michelle W., testified that at about 10:45 or 11 p.m. on February 7, 1983, while driving home she stopped at a red light at 147th and Broadway in Harvey. Two men jumped in the front seat of the car. The one next to her held a box-cutter razor knife to her face and forced her to drive around the corner to a location 100 feet from the intersection. Streetlights provided good lighting, and Michelle was able to see the facial features of the men and what they were wearing.

The man with the knife began to cut her face. The other man emptied the contents of her purse and took $20 or $30. The man with the knife cut her shirt and bra open down the front, also cutting her skin. He then began to cut the upper part of her chest. The other man pulled her head back by the hair. The man with the knife cut her jeans from the waist to the knees. Both men then pulled her legs onto

the car seat. During this time both men were laughing and saying, "Pretty white girl."

The man with the knife pulled Michelle's jeans off as well as his own and had forcible sexual intercourse with her. During this act, lasting five minutes, she could clearly see his face, which was a few inches away. After the act was completed, Michelle's attacker pulled his pants back on. Michelle kicked the man next to the door in the stomach. The car door opened, causing the interior light to go on. Michelle testified that she could clearly see both men as they looked at her. They then fled.

Michelle drove to an ambulance service where she reported that she had been attacked. The police were summoned, and she told them what had happened. She was then taken to the hospital for treatment, including treatment of the knife cuts, which she described as being like scratches.

The State's evidence established that Michelle was then taken to the Harvey police station. She was shown two "mug books," not containing defendants' photographs, and made no identification. The following day, February 8, Harvey detective William Newton came to Michelle's home, where she helped him prepare composite pictures of her assailants. On February 9 Newton showed these composites to Harvey detective James Walker at the police station. Defendant Reginald Sales, also known as Reginald Bey, was at the station to provide Walker with information on some unrelated crimes. Reginald was shown the composites and stated that they resembled the Sykes brothers. Michelle was called to the station and shown an array of 12 photographs, including 3 Sykes brothers, but neither of the defendants. She made no identification.

Newton then showed the composites to Dixmoor detective Anton Graff, formerly of the Harvey police department. Graff told Newman that one picture looked like defendant Roger Sales and the other looked like a Sales brother. (Detective Newton testified that he only knew Reginald as Reginald Bey.) Later that day Michelle was shown a seven-photo array including defendant Roger Sales and Terry Sales. She identified Roger as the man who had raped her. The photograph of Terry was overexposed, and Michelle indicated she could not tell if he was the man accompanying Roger. Michelle subsequently identified both defendants in separate lineups. Reginald was identified in a lineup which included Terry. Michelle also identified both defendants in court as the men who attacked her.

Semen and vaginal fluid taken from Michelle at the hospital was analyzed by Mohammad Tahir, a forensic scientist with the Illinois De-

partment of Law Enforcement. He testified that this material came from a person with type A blood or from a nonsecretor (one whose ABO blood group cannot be detected from body secretions such as semen or vaginal fluids). Michelle was a secretor with type A blood. Reginald and Roger had type B blood, but only Reginald was a secretor. Thus Reginald could not have been the source of the semen. However, as a nonsecretor, Roger could not be excluded as a possible source because the type A blood source could have been exclusively from Michelle's fluids. Tahir also testified that if Michelle had had sex in the week before the attack, seminal material from that prior act of intercourse could have been mixed in with the material he examined.

Both defendants presented alibi defenses. Roger testified that until 11 p.m. that evening he worked at an auto body shop at 8017 South Exchange in Chicago. He then drove to his apartment at 4866 North Magnolia in Chicago, a 25 to 30 minute drive, arriving at 11:30 p.m. Also present at the apartment were Kevin Bailey (with whom he shared the apartment), Andre Robinson, and Webster Phillips. The four of them had dinner and played cards until about 4 in the morning at which time Robinson and Phillips left. Roger testified that he then watched television and went to bed. He also testified that he spent the rest of the night at the apartment with Kevin Bailey. Roger, who was 23 years old at the time of trial, testified that he had no prior convictions.

This alibi testimony was corroborated by Bailey, Robinson, and Phillips, who all testified that they were present with Roger at the apartment at about 11:30 p.m. Kevin Bailey testified that he remained there with Roger all night. On cross-examination he also testified that he had been living with Roger in a homosexual relationship for about six months at the time of the incident. On cross-examination Andre Robinson, who was 30 years old at the time of trial (July 1984), testified that in 1972 and 1973 he and Roger had a homosexual relationship. Since that time they had remained close friends.

Defendant Reginald Sales, 20 years old at trial, testified that he had no prior arrests or convictions. On the night in question, he was at home at 14704 Winchester in Chicago with Tonio Wright and their son. His sister, Valerie Sales, and her husband, Steve Fletcher, came to his home between 9 p.m. and 9:30 p.m. At that time he took a 10-minute trip to the store, but then remained home all night. Steve Fletcher and Valerie Sales both corroborated this alibi, testifying that they arrived at about 9 or 9:10 p.m. and remained until about 1:30 a.m. except for a brief period at about 9:45 when Steve and Reginald went to the liquor store. Steve also testified that Reginald's home was

about three or four blocks from the scene of the attack on Michelle.

In rebuttal the State elicited testimony from Assistant State's Attorney Patrick Quinn and Harvey detective William Newton concerning alibi information given by the defendants after their arrests. Quinn recalled that Reginald told him he had been out with a friend and returned home sometime after 10 p.m. The only people home were his child and live-in girlfriend, and they remained there all night. Detective Newton recalled that Reginald told them he came home about 10:30 p.m., watched television with Tonio and went to bed. According to Newton, defendant did not mention anyone else being there.

According to Quinn, Roger told him he worked till 7 p.m. that evening and then met a friend in Harvey whom he knew only as Kevin B. The two of them left Harvey around 10 p.m., arriving at Kevin's home, in the area of 4800 Broadway, shortly before 11 p.m. On cross-examination Quinn stated Roger told him he was bisexual. Detective Newton recalled that Roger told them he could not recall Kevin's last name. Roger also told them nobody else was at Kevin's apartment.

OPINION

■ We first consider defendants' contention that they were deprived of a fair trial by prosecutorial misconduct throughout the trial. Preliminarily we note that some of these alleged errors were not properly preserved for review by timely trial objections and inclusion in defendants' motion for a new trial. Although ordinarily those errors would be deemed waived, we are not bound to so limit our review. The rule of waiver limits parties, not courts, and reviewing courts may ignore the rule where justice requires it. (*People v. Hoskins* (1984), 101 Ill. 2d 209, 461 N.E.2d 941.) Thus where the alleged errors are such as would prevent a fair trial, this court will consider them despite the waiver doctrine. *People v. Buggs* (1986), 112 Ill. 2d 284, 493 N.E.2d 332; *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.

Our decision to substantively review these allegations is bolstered by another matter which no party has raised in this court but which does appear in the record before us. Prior to trial the State moved to require defendants' counsel to withdraw from the case. The State asserted that counsel's membership on the Harvey civil service commission, a body with disciplinary powers over Harvey police officers, would create a conflict of interest because of the Harvey police officers who would be witnesses at trial. The State further contended

that this inherent conflict was so clear that any conviction would be reversed, even if defendants attempted to waive the issue. Subsequently counsel was permitted to remain in the case after he represented to the court that because of this objection he had resigned his Harvey position, which he had only held for five or six weeks. The record does not reveal whether defendants were informed or consulted concerning this possible conflict. We do not here decide the issue of whether defense counsel's prior service on the civil service commission created a *per se* conflict of interest. (See *People v. Washington* (1984), 101 Ill. 2d 104, 461 N.E.2d 393; *People v. Kester* (1977), 66 Ill. 2d 162, 361 N.E.2d 569.) We would only note that this history supports our determination to review those alleged errors not properly preserved for appeal by trial counsel.

During the State's case in chief, Michelle W., the complainant, was recalled to testify. The State only elicited two statements from her: that she had not had sexual relations with anybody in the 10 days prior to the attack and that before the attack she had never had sexual intercourse with anybody. Eliciting this testimony was clearly prohibited under the Illinois rape shield statute, which provides:

"In prosecutions for *** [rape] *** the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat. 1985, ch. 38, par. 115–7(a).)

The prosecution then made use of this improperly elicited information in final argument, stating that "Roger Sales put his penis into [the complainant] and took her virginity."

We have noted that the prosecution also elicited from two of defendant Roger Sales' alibi witnesses the information that they had been involved in homosexual relationships with Roger. This information was properly adduced because it related to possible bias or prejudice by these witnesses arising out of their relationships with this defendant. (*People v. Adams* (1982), 106 Ill. App. 3d 467, 435 N.E.2d 1203.) But the prosecution did not restrict its use of this information to that proper purpose. In final arguments the prosecutors repeatedly suggested to the jury that Roger's homosexuality could be used as evidence of his guilt. One prosecutor stated to the jury:

"I anticipate that the Defense is going to say that this is a racial case, but remember, Roger and Reginald Sales and the race of the victim—

[Defense Counsel]: Objection.

The Court: Overruled.

[Prosecutor]: I don't even think is [*sic*] the entire motive behind what Roger did.

You heard friends testify, an adult, thirty years old, had sexual relationships, a man, with Roger Sales, twelve years ago in 1972. Well, Roger Sales was a child. He had to be no more than eleven. Here is a young man who has been turned against women and whose rage he expresses that night on Michelle [W.] That's why he had to cut her up. It wasn't just sexual. It wasn't just racial. He wanted to carve up a woman. He has been turned against women for whatever reason."

Then in rebuttal the second prosecutor stated:

"[Defense counsel] mentioned we dragged in homosexual relationships. The only reason that was brought in was to show how close the people really were to Roger Sales. And then when Andre Robinson *** testified, he testified that he had a homosexual relationship with Roger Sales in 1972 or 1983 [*sic*], when Roger Sales was eleven or twelve years old. You know what kind of person he must be. That's a felony; that kind of relationship. Indecent liberties with a child, not to mention enrolling an eleven-year-old boy into that kind of situation.

[Defense Counsel]: Objection.

The Court: Overruled.

[Prosecutor]: When a situation develops, as it did with this woman, what kind of a person would do that to an individual? What kind of person would rape and rob—rape is bad enough, but rape and rob.

You will get a chance to look at the marks on her face. All over her chest, all over her stomach, and you wonder what kind of a person would take a razor knife and keep slashing.

It wasn't until Andre Robinson got through that you realize that someone would sexually abuse an eleven or twelve-year-old. That's the kind of person that would do something like that to somebody."

These comments were grossly improper. As was stated in *People v. Daugherty* (1969), 43 Ill. 2d 251, 255-256, 253 N.E.2d 389, 392:

"Homosexuality is a complex psychological condition which evokes powerful emotional responses from the ordinary man, and a layman cannot be permitted, with no evidentiary support, to argue to a jury his views as to its characteristics."

There was no evidentiary foundation for these remarks by the prosecutors. Indeed the suggestion that Roger had been turned against

women was contradicted by his statement to the police, elicited at trial by the defense, that he was bisexual. These comments appear to have been a calculated attempt to appeal to the prejudice of the jury.

We find a similar purpose apparent in the prosecution's suggestion in final argument that this crime was racially motivated. Before final arguments commenced the State was granted a motion *in limine* to bar defense counsel from making any "racial" arguments. Defense counsel had previously contended to the trial court that the prosecutors had improperly used peremptory challenges to exclude potential black jurors. He had also argued, in a motion for directed verdict, that this case was analogous to the infamous Scottsboro cases in which eight black defendants were unfairly convicted of the rape of two white women by an all-white jury. (*Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55; *Norris v. Alabama* (1935), 294 U.S. 587, 79 L. Ed. 1074, 55 S. Ct. 579.) In anticipation of similar arguments to the jury, the State successfully presented its motion *in limine*. But then the prosecution argued to the jury that the black defendants were racially motivated in attacking the victim, who was white. Again, there was no evidentiary foundation for this. In its brief on appeal, the State does not even attempt to argue that the isolated comment by Michelle's attackers ("Pretty little white girl") provided a sufficient basis for this argument. Rather, the State contends that these comments were at most harmless error given the "overwhelming" nature of the evidence of defendants' guilt.

Although we find that the State's evidence was sufficient, if believed by the jury, to establish the defendants' guilt beyond a reasonable doubt, we do not find this evidence to have been so overwhelming as to render harmless all the errors we have cited. The contested issue in this cause was not whether the victim had been brutally attacked, but whether she correctly identified her attackers. The defendants presented alibi testimony which, although impeached in some respects, might have been believed by an untainted jury.

■ In this trial the prosecutors did not fulfill their obligation as the representatives of the people of this State to ensure that the defendants received a fair trial. (*People v. Oden* (1960), 20 Ill. 2d 470, 170 N.E.2d 582; see *People v. Ray* (1984), 126 Ill. App. 3d 656, 664, 467 N.E.2d 1078, 1084.) The prosecutors' improper use of race, the victim's sexual history, and the homosexuality of one of the defendants provides us with a reasonable basis for believing that the jury was prejudiced, thus depriving defendants of a fair trial and requiring a new trial. *People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629.

Because we reverse on this basis we do not reach defendants' con-

tentions concerning the prosecutors' use of peremptory challenges. Of course upon retrial after remand, the defendants will have available to them the protection of the procedures outlined in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

For the reasons set forth in this opinion defendants' convictions are reversed and this cause is remanded for a new trial.

Reversed and remanded.

SULLIVAN, P.J., and MURRAY, J., concur.